# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DANNY HOUSE, | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 3:10-cv-0690 |
| v. | ) | Judge Nixon/Brown |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI), as provided under Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 15, 23). The Magistrate Judge has also reviewed the administrative record and supplements (hereinafter "Tr."). (Docket Entries 12, 18, 22).[1] For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I.  INTRODUCTION

Plaintiff first filed for Social Security Income ("SSI") on May 10, 2006. (Tr. 10). Plaintiff's claim was denied initially and on reconsideration. *Id.* He requested a hearing before

---

[1]  The administrative record and supplements are numbered sequentially, with Docket Entry 18 containing pages 330-34 and Docket Entry 22 containing pages 335-77.

the ALJ, which was held on March 27, 2009 before ALJ Barbara Kimmelman. (Tr. 335-77).[2]

The ALJ issued an unfavorable decision on June 24, 2009. (Tr. 7-20).

In her decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since May 10, 2006, the application date. (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: obesity; asthma; blindness with prosthesis in the right eye; depressive disorder; borderline intellectual functioning. (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 50 pounds occasionally and 25 frequently, stand and walk 6 hours and sit 6 hours in an 8 hour workday, is unable to perform work that requires depth perception, and should avoid all exposure to heights, moving machinery, driving, and pulmonary irritants. Regarding mental limitations, the claimant retains the residual functional capacity to perform simple 1-2 step tasks and have occasional interaction with the general public.

5.  The claimant is capable of performing past relevant work as a lot porter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 416.965).

6.  The claimant has not been under a disability, as defined by the Social Security Act, since May 10, 2006, the date the application was filed. (20 CFR 416.920(f)).

The Appeals Council denied Plaintiff's request for review on June 19, 2010. (Tr. 1-4).

This action was timely filed on July 20, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on April 10, 1967 and is currently 43 years old. (Tr. 101). He has an

---

[2] The Commissioner originally submitted a transcript that did not contain the Vocational Expert's complete testimony. (Tr. 21-61).

8th grade education.  (Tr. 32).  Plaintiff has previous work experience as a car washer (lot porter), laborer, and delivery person.  (Tr. 127, 133-36).  Plaintiff apparently previously received SSI benefits from 1993 to 1996, which he terminated because he wanted to return to work.  (Tr. 159).

Plaintiff applied for SSI on May 10, 2006, alleging an onset date of November 14, 2004, which was later amended to May 10, 2006.  (Tr. 10).  Plaintiff alleged he is disabled as a result of mental disorder and loss of vision in his right eye.  (Tr. 126).  Plaintiff's claims were denied initially and on reconsideration.  (Tr. 10).

Plaintiff was shot in the face with buck shot in December 1989.  (Tr. 178).  The hospital discharge summary notes that the bullet passed through Plaintiff's left lower lip and tongue, through the right soft palate.  *Id*.  Fragments seemed to be lodged in the base of the tongue and in the posterior superior nasopharynx.  *Id*.

On May 5, 2000, Plaintiff visited Dr. Wen T. Shiao, his primary care provider.  (Tr. 293). Plaintiff sought cholesterol, blood glucose, and blood pressure checks.

On March 11, 2005, Plaintiff sought treatment at the emergency room at Southern Hills Medical Center.  (Tr. 201-02).  Plaintiff stated he had been assaulted in the face with a stick.  *Id*. On examination, the attending physician, Dr. Lisa Yezbak, noted Plaintiff's right globe was ruptured.  *Id*.  Dr. James Felch repaired Plaintiff's right eye injury.  (Tr. 196-907, 203).  On May 27, 2005, Dr. Brian Biesman removed Plaintiff's right eye and replaced it with a prosthesis.  (Tr. 216-17).

On March 23, 2005, Plaintiff sought treatment at Southern Hills Medical Center for a sinus headache, pain, and congestion.  (Tr. 320).

Plaintiff saw Dr. Shiao again on April 26, 2006. (Tr. 293). He was concerned about his weight and wanted advice on losing weight and a general check-up. *Id*. Dr. Shiao noted Plaintiff was obese, suffered from depression, and had right eye blindness.[3] *Id*.

Dr. Felch wrote a letter to DDS dated June 16, 2006, noting he had seen Plaintiff on one occasion, when he was hospitalized due to a ruptured globe on the right side. (Tr. 219). He stated Plaintiff has been blind in his right eye since that date but continues to have good vision in the left eye. *Id*. Dr. Felch noted Plaintiff has no depth perception, which could "affect his ability to do a certain kind of work, particularly work at high altitudes or those requiring stereopsis." *Id*.

Plaintiff saw Dr. Walter Frey on July 3, 2006. (Tr. 220-21). Dr. Frey wrote a letter to DDS dated July 7, 2006, noting Plaintiff was blind in his right eye and had an uncorrected visual acuity in his left eye of 20/200, best corrected to 20/20. (Tr. 220). Dr. Frey concluded that "all aspects of the exam of the left eye appeared to be normal." *Id*.

Ms. Alice Garland, M.S., conducted a consultative exam of Plaintiff on July 14, 2006. (Tr. 222-26). Ms. Garland conducted a clinical interview, a mental status examination, review of Plaintiff's records, and an interview of Plaintiff's sister, Lisa Jones. (Tr. 222). Ms. Garland noted Plaintiff was "cooperative but a very poor informant." *Id*. Ms. Garland described Plaintiff's motor activity as average and his grooming and hygiene as good, and Plaintiff was neatly dressed. (Tr. 224). Plaintiff wore dark glasses, had a slumped posture, and walked slowly. *Id*. He was not sure of the specific date, could not recall any of the three objects mentioned after five minutes, could name one recent president, did not know a recent news event, and could not spell "world" backwards. *Id*. Ms. Garland described Plaintiff as sweaty, extremely emotionally

---

[3] A fourth condition was diagnosed, but it is illegible. The condition is possibly hypertension.

labile, sometimes nonresponsive, having a flat affect and poor insight and judgment, and tearful and agitated. *Id*. She stated Plaintiff knew the shape of a basketball and colors of the American flag. *Id*. There was no indication Plaintiff had a thought disorder. *Id*. Plaintiff told Ms. Garland he was suicidal all the time but had never attempted suicide. (Tr. 224-25). Ms. Garland estimated Plaintiff's intelligence as mildly retarded to borderline. (Tr. 224). She stated it was very difficult to get specifics from Plaintiff, and his sister was "not the best of informants." (Tr. 225). Ms. Garland diagnosed Plaintiff with major depressive disorder recurrent, moderate to severe without psychotic features, noting cognitive disorder and bipolar disorder should be ruled out. *Id*. She evaluated his Global Assessment of Functioning ("GAF") score as 48.[4] (Tr. 226). She stated Plaintiff would have difficulty with very detailed and complex work, with severely limited abilities to persist and concentrate, work with the public and to adapt. (Tr. 226). Ms. Garland noted that the information she was able to obtain was "rather sketchy" and suggested that DDS should "obtain objective third-party reports to better determine the claimant's level of functioning," though Plaintiff "appeared to be low functioning" on the day of the exam and "very self-focused and emotionally labile." *Id*.

Dr. Dorothy Tucker completed a DDS Medical Consultant Analysis on July 26, 2006.

---

[4] The Global Assessment of Functioning test is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

(Tr. 227-30). Dr. Tucker noted there was insufficient evidence. (Tr. 227). She explained that there was very little data other than Ms. Garland's evaluation and a report of a bullet in Plaintiff's brain, with no medical records. (Tr. 230). Dr. Tucker suggested Plaintiff undergo IQ testing and a Wechsler Memory Scale. *Id*.

Ms. Garland evaluated Plaintiff again on August 27, 2006. (Tr. 231-33). During that examination, she administered the WAIS-III, WRAT-3, and the Rey 15-Item Test. (Tr. 231). Ms. Garland was unable to administer the Wechsler Memory Scale because of Plaintiff's poor participation in testing. *Id*. On the WAIS-III, Plaintiff's scores yielded a Verbal IQ of 53, a Performance IQ of 55, and a Full-Scale IQ of 50, which is in the lower end of the mildly mentally retarded range. (Tr. 232). Ms. Garland did not believe Plaintiff's scores were valid. *Id*. She described the WAIS–III test as follows:

> on Picture Completion, the claimant obtained a raw score of 2 and it took him until item 6 to do so. On Vocabulary, the claimant obtained a raw score of 11 and he obtained no correct answers after item 8. On Digit Symbol-Coding, he sometimes put the correct symbol under the number and, at other times, did not. On Similarities, he obtained a raw score of 2 and he obtained no correct answers after item 2. On Block Design, he obtained a raw score of 9 and he obtained no correct answers after item 5. On Arithmetic, he obtained a raw score of 5 and obtained no correct answers after item 5. Often there was no response when the examiner asked a question. On Matrix Reasoning, he obtained a raw score of 2 and he obtained no correct answers after item 2. On Digit Span, he repeated two groups of two numbers forward successfully and one group of two numbers backwards. He obtained a raw score of 3 on Information. It took him until item 4 to obtain that score. He obtained no correct answers after item 4. He obtained a raw score of 2 on Picture Arrangement and did not attempt to pick up the cards after item 1. On Comprehension, he obtained a raw score of 1 and obtained no correct answers after item 1.

(Tr. 232). Ms. Garland further noted that, on the WRAT-3, Plaintiff read on the kindergarten grade level and calculated math on the 1st grade level. (Tr. 233). Ms. Garland believed that

these scores would contraindicate Plaintiff's ability to obtain a driver's license, which Plaintiff had at one time. *Id*. Ms. Garland concluded that Plaintiff's "primary diagnosis would be malingering." *Id*. She believed he does have intellectual limitations, but the evaluations she conducted did not reflect Plaintiff's true ability. *Id*.

Dr. Tucker completed a Psychiatric Review Technique on September 27, 2006. (Tr. 234-47). She concluded Plaintiff was not credible, based on his diagnosis by Ms. Garland as malingering and on his reporting that he had a bullet in his brain, which was contradicted by his medical records. (Tr. 246).

Plaintiff saw Dr. Elliott Ward, Ph.D. for a consultative examination on February 9, 2007. (Tr. 278-81). Plaintiff's sister accompanied him. (Tr. 278). Dr. Ward believed Plaintiff was "significantly malingering," noting that the information obtained from Plaintiff was "likely inaccurate intentionally presented. *Id*. Dr. Ward noted that Plaintiff did not use the pronoun "I" during the exam, instead using the pronoun "me," because he apparently "has the idea that persons with limited cognition also have very distorted grammar which is simply not the case." *Id*. Dr. Ward observed Plaintiff showed no indication of depression or anxiety. (Tr. 279). Dr. Ward summarized the mental status exam as follows:

> He was given 18 orientation questions and correctly answered 1. He did state, when asked the current month that, "Me sister says it's February." However, when asked his age he reports he is 22. When asked his date of birth he states it is 9/25/81. When asked where he was born, "5445 Picky Woods." He gave an incorrect Social Security number, but he did give it in digits of 3, 2, and then 4. He added a fifth number at the end. When asked his address, he states it is, "5445 Picky Woods." He states he does not know the date, but alleges it may be 2006.

> He was given four words to retain and, as expected, did not retain any of the four. Category hints and multiple choice hints did not increase recall. He was then asked to repeat sentences. He was given the sentence, "Where is my dinner?" His response was, "Dinner." Having evaluated even very limited individuals with IQs

in the upper 40's, it is my awareness that most everyone will repeat the sentence, "Where is my dinner?" correctly.

He was then asked to count backwards from 10 to 1. He counted as follows, "10, 3, 7, 16, 2." He was given digit span. He did correctly give two digits forward. He did not correctly give the three digits forward and did not give any digits reverse. He was then given a word fluency test. He was asked to list as many animals as he could in one minute and he gave the following list, "Chester, snake, bam-bam, dog, monkey, bo-wee and Chester." When asked to list fruit he gave apple, orange, tomato and "me PA."

He was then given basic validity questions. He stated that there are 120 minutes in an hour. He does not know the colors of the American flag. He states that December is the month that occurs after March. He noted that a dog has six legs. He did correctly say the shape of a ball is round. He also noted that 41 is larger than 18.

(Tr. 279-80).

Dr. Ward gave Plaintiff the Rey 15-item Test of Malingering. (Tr. 280). Dr. Ward noted that, in his experience, "persons that are malingering do not simply leave out items, but they will either distort the test or repeat items on the test." *Id*. Plaintiff did both, which confirmed Dr. Ward's observations that Plaintiff was malingering. *Id*. Dr. Ward noted no unusual behavior aside from Plaintiff's malingering, and he could not make a functional capacity assessment due to Plaintiff's level of malingering. *Id*.

Dr. George T. Davis completed a Psychiatric Review Technique dated March 17, 2007. (Tr. 260-73). Dr. Dixon noted the medical evidence in the file was insufficient, and Plaintiff failed to cooperate with the consultative examiner. (Tr. 272).

On April 17, 2007, Dr. William L. Downey completed a DDS Medical Consultant Analysis. (Tr. 274-77). Dr. Downey concluded Plaintiff's impairments were not severe and "pose[d] no significant limitations to his ability to perform many normal daily activities. (Tr. 277).

Plaintiff sought treatment for sinus congestion and headache at Southern Hills Medical Center on February 14, 2007. (Tr. 314). Plaintiff again visited the emergency room at Southern Hills Medical Center on October 6, 2008, complaining of a headache and sinus problems. (Tr. 306). He declined hospital admission. (Tr. 309).

Plaintiff next sought treatment from Dr. Shiao on November 25, 2008. (Tr. 292). He requested a stress test and a prostate exam, and he complained that his blood pressure medication was making him sick. *Id*. Plaintiff was "doing okay otherwise." *Id*. Dr. Shiao's notes reflect Plaintiff had asthma, marked obesity, and HTN.[5]

Dr. Shiao treated Plaintiff again on December 12, 2008 and on January 9, 2009. (Tr. 291). On December 12, Plaintiff came in for a follow-up appointment. *Id*. Plaintiff complained of being nervous and having anxiety. *Id*. On January 9, Plaintiff requested Dr. Shiao fill out medical forms. *Id*. He also requested a stronger dose of pain medication for his headaches. *Id*.

Dr. Shiao completed a Medical Source Statement for Plaintiff dated January 9, 2009. (Tr. 284-90). Dr. Shaio stated Plaintiff is "a marked obese African American male with [sic] slowly to walk with weakness." (Tr. 284). He opined Plaintiff could occasionally lift and carry up to 50 pounds, could sit or stand one hour at a time and could walk less than one hour at a time, and could sit or stand less than one hour in an eight-hour workday and could walk for ten minutes in an 8-hour workday. (Tr. 284-85). He stated Plaintiff lies down to watch television. (Tr. 285). Plaintiff could reach, handle, and push or pull occasionally but could finger or feel frequently. (Tr. 286). Dr. Shiao stated there were no medical or clinical findings supporting this particular limitation. *Id*. He noted Plaintiff walked very slowly because of marked obesity and back

---

[5] The Magistrate Judge assumes "HTN" stands for hypertension.

problems and, as a result, could operate foot controls only occasionally. *Id*. Dr. Shiao believed Plaintiff could occasionally climb stairs and ramps and balance, but he could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (Tr. 287).

Dr. Shiao also stated Plaintiff had vision impairment, rendering him unable to avoid ordinary hazards in the workplace, read very small print, view a computer screen, or determine differences in shape and color of small objects. (Tr. 287). Dr. Shiao believed Plaintiff must have a quiet work environment and could never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, pulmonary irritants, extreme cold, extreme heat, vibrations, and others (although Dr. Shiao did not identify what other environmental limitations Plaintiff had). (Tr. 288). Dr. Shiao stated Plaintiff could not perform activities like shopping, must travel with a companion, could not walk a block at a reasonable pace on rough or uneven surfaces, could not use standard public transportation, could not climb a few steps at a reasonable pace with the use of a single hand rail, and could not sort, handle, or use paper/files. (Tr. 289). Dr. Shiao checked both "yes" and "no" for the question, "Can the individual care for personal hygiene?" *Id*. Dr. Shiao noted Plaintiff has lower intelligence, asthma, and depression. *Id*.

On March 27, 2009, Plaintiff testified at his hearing before ALJ Kimmelman. (Tr. 335-77). He stated he had a previous job washing cars on a car lot, but he started "messing up" and went to work as a driver for a blueprint company. (Tr. 344). He had a knee injury and was apparently fired from that job after about a year. (Tr. 345). Plaintiff lost his driver's license as a result of tickets. (Tr. 347).

Plaintiff testified he could lift something "pretty light," has problems standing due to his

back, and he cannot walk for long periods of time. (Tr. 351-52). Plaintiff testified he believes he cannot work because he is never able to do things right, even though he does not understand why they are wrong and because he talks to himself. (Tr. 348). Plaintiff also stated he has asthma and back problems. (Tr. 349). He also complained of knee pain; he injured his right knee approximately seven to eight years ago and had surgery. (Tr. 356). He also indicated he needs to lose weight, as he weighed 328 pounds as of the date of the hearing, at a height of 5' 9". *Id.* Plaintiff takes medications for high blood pressure, and his sinuses (Hydrocodone). (Tr. 357).

Plaintiff stated he cannot see well, even with glasses. (Tr. 358). His testimony is somewhat unclear on this point, because he stated, "I bump stuff all the time, knock stuff over but I can see if I put my glasses on but if I take them off I can see just a little bit." *Id.* He noted that he continues to bump into things with his glasses on, however. *Id.*

Plaintiff stated he had been shot twice, once in the mouth and once in the back. (Tr. 353). He stated he has a bullet in his head. (Tr. 358-59).[6] He also testified that he lost his right eye when he was attacked and hit with a stick. (Tr. 354). The attack made him worse at home, and he now sits in the house and does not want to go anywhere. *Id.* Plaintiff stated that he can read somewhat, but he has always had problems forgetting things, and those problems worsened after he was hit in the head. (Tr. 355).

Plaintiff stated he spends most of his time watching TV. (Tr. 359). He does some cleaning around the house, when he remembers. (Tr. 359-60). He testified that he thinks he could wash cars again. (Tr. 360).

_____

[6] This testimony was clarified by his brother, who stated Plaintiff has a bullet lodged in his esophagus. (Tr. 363-64).

Plaintiff's brother, Johnny House, testified that Plaintiff has lived with him for approximately three years. (Tr. 361-62). Mr. House stated he must watch Plaintiff around the kitchen, because he is afraid Plaintiff will burn the house down. (Tr. 363). Plaintiff has not caused any house fires, however. *Id*.

Mr. House testified that Plaintiff has a bullet lodged in his esophagus because the doctors believed they would cause more damage by removing it. (Tr. 363-64). He stated Plaintiff was shot because they lived in the projects. (Tr. 364).

Plaintiff's health has declined since his eye was removed, according to Mr. House. (Tr. 365). Plaintiff suffers from poor vision, headaches, and light sensitivity. *Id*. He wears tinted glasses most of the time. *Id*. He is also worse mentally. *Id*. Plaintiff does not listen to his brother as well as he did before he was hit in the head. *Id*.

Mr. House stated Plaintiff was fired from his jobs as a messenger/delivery person and as a lot porter. (Tr. 366). He could not keep up with the pace needed at the car lot. *Id*. Mr. House believed Plaintiff cannot work because he is mentally disabled. (Tr. 367). He was unsure whether Plaintiff had ever been in special education classes in school. (Tr. 366-67).

Rebecca Williams, a Vocational Expert ("VE"), testified that Plaintiff had previous work experience as a lot porter, which is medium and unskilled, and as a courier, which is light and unskilled. (Tr. 374). The ALJ asked Ms. Williams if a hypothetical individual could perform Plaintiff's past work, if that individual shared Plaintiff's age, education, and work background, but would be limited to lifting 50 pounds occasionally and 25 pounds frequently; could sit, stand, and/or walk for up to six hours in an eight-hour workday; would be limited to simple, one to two-step repetitive tasks; could work only occasionally with the public; has no depth perception;

should not be driving; and should not be exposed to pulmonary irritants. (Tr. 375). Ms. Williams believed that hypothetical individual could not work as a courier but could work as a car porter. *Id.*

Plaintiff's attorney asked Ms. Williams if Plaintiff could perform the lot porter job if Dr. Shiao's medical source statement were given full credence. (Tr. 375). Ms. Williams said that he would not be able to work full-time, because Dr. Shiao opined Plaintiff can sit a total of one hour in an eight-hour workday, could stand a total of one hour in an eight-hour workday, and could walk for 10 minutes in an eight-hour workday. (Tr. 376). When asked what the significance of a GAF score of 48 would be, Ms. Williams answered that, without any other information, a person would not be able to sustain employment because that is essentially the definition of a score of 50 or below. *Id.*

After the ALJ issued her opinion, Plaintiff submitted a Confidential Intellectual Evaluation prepared by Susan E. Pruitt, MA. (Tr. 330-34). Ms. Pruitt administered the Wechsler Adult Intelligence Scale III ("WAIS III") on July 17, 2009. (Tr. 330). She noted Plaintiff was cooperative and responsive, trying "extremely hard to address every test item presented." *Id.* In her opinion, "[t]he obtained psychometric data are considered to be a valid estimate of Mr. House's current level of functioning." *Id.* She measured Plaintiff's Full Scale IQ at 64, which she described as in the extremely low range of intellectual functioning, within the range of mild mental retardation. (Tr. 331-32). Ms. Pruitt was unsure whether Plaintiff's intellectual functioning had been this low his entire life or was caused by dementia or age-related cognitive decline. (Tr. 332). She noted, however, that Plaintiff did not finish school beyond the 8th grade, suggesting some learning issues early in life. *Id.*

The Appeals Council examined Ms. Pruitt's report in its decision. (Tr. 2). The Appeals Council believed Ms. Pruitt's report addressed a later time than the ALJ's decision of June 24, 2009 and suggested Plaintiff apply again. *Id.*

## III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff's Motion does not clearly list the alleged errors. The Magistrate Judge believes the Commissioner's Response accurately reflects those errors identified by Plaintiff. First, Plaintiff believes this case should be remanded because of new evidence presented to the Appeals Council. Second, Plaintiff alleges the ALJ erred by failing to properly consider his complaints of mental limitations, particularly in light of Ms. Garland's first consultative evaluation. Third, Plaintiff argues that the ALJ improperly evaluated his obesity. Fourth, the ALJ did not properly consider or weigh the opinion of Dr. Shiao. Fifth, the ALJ did not properly explain her past relevant work finding. Sixth, the ALJ did not properly evaluate Plaintiff's complaints of pain.

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d

244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.    Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.    If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.    If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.    If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.    If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.    Once the claimant establishes a *prima facie* case of disability, it becomes the

---

[7] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

> Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.     A Remand Pursuant to Sentence Six Is Not Appropriate

Plaintiff seeks a remand pursuant to 42 U.S.C. § 405(g), for the consideration of Ms. Pruitt's evaluation.  Ms. Pruitt evaluated Plaintiff on July 17, 2009, nearly four months after Plaintiff's hearing and approximately three weeks after the ALJ's decision.  (Tr. 330).  As an initial matter, the Magistrate Judge may not consider Ms. Pruitt's report when deciding whether the ALJ's decision is supported by substantial evidence, because the ALJ never saw the report. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  The Magistrate Judge may, of course, remand Plaintiff's case for further proceedings in light of the new evidence.  *See id.*  Such a remand is only appropriate, however, if the evidence was "not in existence or available to the claimant at the time of the administrative proceeding" and if it is material, *i.e.*, if it is reasonably probable "that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (internal quotations omitted).  The claimant must also show good cause "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*

While Plaintiff meets the first requirement, because the evidence was not in existence until July 17, 2009, he cannot meet the other two. Plaintiff's intelligence was tested twice by consulting experts for the Commissioner, and he was suspected of malingering both times. (Tr. 232-33, 278-81). It is therefore not at all clear that a different disposition would be warranted by Ms. Pruitt's evaluation. Moreover, as the Appeals Council pointed out, Ms. Pruitt did not find that Plaintiff's intellectual ability was present at the alleged onset date, although she suspected that might be the case. (Tr. 332). Finally, Plaintiff cannot demonstrate good cause for failing to acquire an additional evaluation prior to his hearing before the ALJ. At the latest, Plaintiff knew that two consultative examiners had concluded he was malingering on January 28, 2009. (Tr. 173). Plaintiff offers no argument for his delay in obtaining an additional opinion and has therefore not carried his burden of showing that a remand is appropriate. *See Foster*, 279 F.3d at 357.

D.     The ALJ Properly Considered Plaintiff's Psychological Complaints

Plaintiff's argument on this point appears to be that, because Ms. Garland diagnosed Plaintiff with major depressive disorder, with a GAF of 48, the ALJ should have found him disabled. (Tr. 222-26). The ALJ noted Plaintiff's depressive disorder when listing his severe impairments. (Tr. 12).

When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ

17

must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be documented in her decision. *Id.*

Here, the ALJ noted that Plaintiff does not suffer from at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation. (Tr. 13). The ALJ properly considered the "A" and "B" criteria by examining Ms. Garland's findings and Plaintiff's ability to function. In addition, the ALJ noted that Ms. Garland, in her second evaluation of Plaintiff approximately six weeks after her first evaluation, believed he was malingering. (Tr. 17).

Plaintiff's argument seems to hinge mostly on the GAF score Ms. Garland assigned to Plaintiff, which, according to the Vocational Expert, would put him in the "unable to keep a job" category.[8] (Tr. 376). However, GAF scores are not determinative of disability. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). The ALJ noted that Ms. Garland's assessment was based on "rather sketchy information" and that Ms. Garland "suggested third-party reports might be used to better determine [Plaintiff's] level of functioning." (Tr. 16). When Ms. Garland further evaluated Plaintiff a few weeks later, she diagnosed him as malingering. (Tr. 17). The ALJ took both Ms. Garland's evaluations into account, along with other evidence in the record,

---

[8] The Vocational Expert qualified her opinion, noting that her opinion was assumed without any other information and that the definition of a GAF of 50 or below is that the person would not be able to sustain employment.

and determined that Plaintiff's GAF score should not be determinative of his level of functioning. The Magistrate Judge therefore believes the ALJ properly evaluated Plaintiff's psychological complaints.

E.      The ALJ Properly Evaluated Plaintiff's Obesity

Plaintiff argues that, because his body mass index ("BMI") is 44.2, classified as extreme obesity, the ALJ failed to properly analyze the effects of his obesity in her residual functional capacity assessment. The ALJ noted Plaintiff's BMI and noted "[o]besity has been considered based on Social Security Ruling 02-1p." (Tr. 19). SSR 02-1p requires that an ALJ make an assessment regarding the effects of obesity on any mental or physical limitations.

In this case, Plaintiff has no evidence outside Dr. Shiao's medical source statement that indicates his obesity causes physical limitations. As discussed below, the ALJ properly discounted Dr. Shiao's evaluation of Plaintiff's sitting, standing, and walking limitations. During his testimony before the ALJ, Plaintiff indicated that his mental limitations were the primary reasons he could not work. (Tr. 348). The ALJ noted this in her decision. (Tr. 19). In short, the Plaintiff offered almost no evidence of the functional consequences of his obesity. The Magistrate Judge therefore believes the ALJ properly considered Plaintiff's obesity.


F.      The ALJ Properly Evaluated the Opinion of Dr. Shiao

Plaintiff argues the ALJ improperly discounted Dr. Shiao's medical source statement. An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if

that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

In rejecting Dr. Shiao's opinion, the ALJ noted that Dr. Shiao had very few appointments with Dr. Shiao, and there was no objective evidence of Plaintiff's back problems on the record. (Tr. 19). Plaintiff primarily saw Dr. Shiao for a stress test, blood pressure medication, a prostate check, and weight loss counseling. *Id*. There is no evidence in Dr. Shiao's treatment notes that would support the limitations on sitting, standing, and walking in his medical source statement. The Magistrate Judge believes the ALJ properly rejected these limitations.

G.     The ALJ Properly Explained Her Past Relevant Work Finding

Plaintiff makes a short statement that the ALJ did not adequately describe her rationale for deciding Plaintiff could return to his past work as a lot porter. The Magistrate Judge believes this

has been addressed in the discussions regarding Dr. Shiao's opinion and the ALJ's evaluation of Plaintiff's obesity. To the extent that it has not, the Magistrate Judge believes the ALJ adequately explained her finding that Plaintiff could return to his past relevant work. The ALJ clearly discussed the Vocational Expert's testimony regarding Plaintiff's past work as medium, unskilled work and considered it in light of the determined residual functional capacity. (Tr. 20).

H.    The ALJ Properly Evaluated Plaintiff's Complaints of Pain

Plaintiff makes the barest of arguments on this point, stating that the ALJ "also failed to properly evaluate the claimant's pain." (Docket Entry 16, p. 11). To the extent that the Plaintiff attacks the ALJ's credibility determination, the Magistrate Judge believes the ALJ had sufficient evidence for discounting Plaintiff's subjective complaints. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

Here, the ALJ had substantial evidence for her adverse credibility finding. Two consulting examiners had found Plaintiff was malingering. The ALJ's discounting of Plaintiff's subjective complaints of pain was warranted based on this finding.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be

**DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 17th day of March, 2011.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge